**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DENNIS L. ECHOLS,** ) | |
| ) | **Case Number 04-243 ERIE** |
| Plaintiff ) | |
| ) | **District Judge Sean J. McLaughlin** |
| vs. ) | **Magistrate Judge Susan Paradise Baxter** |
| ) | |
| **JOANNE B. BARNHART,** ) | |
| **Commissioner of Social Security** ) | |
| Defendant ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.    RECOMMENDATION**

It is recommended that the Motion for Summary Judgment filed by the Plaintiff [Document # 7] be granted.  It is further recommended that the Motion for Summary Judgment filed by the Defendant [Document # 9] be denied.  This matter should be remanded to the Social Security Administration for further proceedings.

**II    REPORT**

**A.    Procedural Background**

Plaintiff  (Echols) brings this action pursuant to Section 216(i), 223 and 1614(a)(3)(A) respectively of the Social Security Act (the Act), seeking judicial review of a final decision by the Commissioner of Social Security denying his Application for Disability Insurance Benefits and Supplemental Security Income Disability payments.  After his application was denied by Notice dated May 20, 2003, Plaintiff requested a hearing which was conducted before an Administrative Law Judge (ALJ) on December 19, 2003 and at which Echols was represented by counsel.  The ALJ issued a decision denying Echols' claim for Social Security Disability Insurance benefits, as well as Supplemental Security Income Disability benefits, effectively concluding that Echols was not under a "disability" as that term is defined under the Act at any

1

time prior to the date of the March 23, 2004 claim denial. R. 17.[1]  Echols sought administrative review from the SSA's Appeals' Council, which was denied by Order of the Appeals' Counsel dated June 25, 2004.

Echols now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). He alleges errors entitling him to a new administrative hearing. The Commissioner disagrees. Both Echols and the Commissioner have filed a motion and cross-motion, respectively, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and the matter is ripe for disposition by this Court.

**B.      Factual Background**

Plaintiff Echols was born on September 24, 1953. Echols was fifty years old when the Commissioner issued her final decision. R. 13. He has a high school education and has past relevant work experience as a carpenter, dump truck driver, maintenance worker, and bodyshop worker. R. 69, 74. Echols alleges that he has been unable to work since December 5, 1995 due to a back injury, with the addition of Hepatitis C in November 2002. R. 68.[2]

**C.      Medical Background**

In December of 1995, Plaintiff suffered a low back injury while in the course of his employment. R. 346. Thereafter, Plaintiff began suffering chronic and severe lower back pain

---

[1] The Court's recitation of relevant facts is derived from the transcript of the administrative record filed by the Commissioner as part of her answer in accordance with § 205(g)of the Act, 42 U.S.C. § 405(g), which is referred to hereinafter as "R." Additional citations appear as necessary.

[2] Echols is insured for purposes of his claim for Social Security Disability Insurance benefits only through March 31, 1996. Therefore, to be entitled to Social Security Disability Insurance benefits, Echols would have had to prove that he became disabled on or before March 31, 1996. 20 C.F.R. § 404.131. However, Echols' remaining claim for Supplemental Security Income Disability benefits requires only proof that Echols is under a "disability" at any time up to and including the date of the ALJ's decision, and, otherwise, meets certain income and resource limitations. 20 C.F.R. § 416.202.

2

with some radiation down his legs. R. 347.

In February 1996, Plaintiff consulted with an Orthopedic Surgeon, Lawson Smart. An MRI of the lower spine revealed a small central disc herniation at the L5-S1 level with mild impingement on the thecal sac. Plaintiff was prescribed Indocin, an anti-inflammatory, and Vicodin, for pain. Dr. Smart also prescribed moist heat and stretching and indicated that Plaintiff could not return to work, but should check on "light duty possibilities." R. 191- 192.

On June 11, 1996, Plaintiff was treated at the Pain Clinic by Dr. Macielak, who concluded that Plaintiff was suffering from a left lower extremity radiculopathy, along with S1 dermatome and secondary to the herniated disc at the L5-S1 level. Dr. Macielak concluded that Plaintiff was not able to work and prescribed Talwin for pain. Dr. Macielak suggested that Plaintiff consider a surgical option to address his situation. R. 173 - 176.

In November 1996, Plaintiff returned to the Pain Clinic complaining of increased pain in his back and leg, with numbness in his left foot. A CT scan dated June 14, 1996 confirmed the presence of a disc herniation at L5-S1, larger than that revealed by a previous MRI and now compressing on the nerve root. R. 178, 171. Dr. Macielak opined that Plaintiff was not capable of work.

In January 1997, Plaintiff returned to Dr. Macielak, who suggested surgical intervention. R. 171. On March 20, 1997, Plaintiff underwent a laminotomy procedure. R. 145 -152. In May of 1997, Dr. Macielak reported a setback in Plaintiff's recovery, possibly due to a recurrent disc herniation or increased nerve root irritation. R. 143. By June of 1997, Plaintiff was still significantly symptomatic as to his left lower leg pain. An MRI conducted on June 20, 1997 suggested a recurrent disc herniation. R. 141. Plaintiff began physical therapy in July 1997 in order to increase his strength and range of motion. R. 140.

Between February 1997 and September 1997, Dr. Macielak consistently indicated in the medical records that Plaintiff was unable to work. R. 164 - 170.

In September of 1997, a formal physical capacity evaluation performed by John Hilson, a physical therapist, indicated that Plaintiff had the ability to sit and stand for no more than twenty to twenty-five minutes with walking limited to moderate distances, lifting abilities measured at

3

twelve to fifteen pounds. The therapist opined that Plaintiff should be encouraged to work toward a vigorous exercise program. R. 128 - 135.

On September 30, 1997, Plaintiff saw Dr. Macielak who suggested that Plaintiff was improving but was to remain limited to light duty with no more than twenty pounds maximum lifting on a part-time basis. R. 162-163.

Plaintiff was last seen by Dr. Macielak in September 1998 [3] when he complained of increased pain. Plaintiff complained that his pain level intensified as each day wore on proportional to the amount of activity he performed that day. Dr. Macielak concluded that Plaintiff was unable to work. R. 164.

On November 5, 2002, Plaintiff presented to Kristin Templin, his Primary Care Physician, complaining of nausea, vomiting, syncope, pre-syncope, weakness and fatigue for more than six months. Blood work revealed that Plaintiff was suffering from Hepatitis C.[4] R. 261 -262. Dr. Templin referred Plaintiff to Bruce Dratler, a Gastroenterologist.

On January 10, 2003, Plaintiff consulted with Dr. Dratler, who recommended treatment of Pegulated Interferon and Rivavarin. Dr. Dratler explained that the side-effects of such treatment could include increased depression, flu-like symptoms, reduced white blood cell count and reduced platelet count. Plaintiff chose to proceed with the therapy. R. 246.

On February 18, 2003, Plaintiff began the treatment. On February 25, 2003, Plaintiff reported to Dr. Templin that since beginning the Interferon treatments, he experienced fatigue, tinnitus and pounding headache. He also reported chronic low back pain and intermittent sciatica. Dr. Templin prescribed Vioxx for back pain and assured Plaintiff that his tinnitus was secondary to the Interferon therapy. R. 320.

---

[3] At the ALJ hearing, Plaintiff explained that he stopped seeing Dr. Macielak when he settled his worker's compensation case and lost his medical insurance. Plaintiff testified that he continued to suffer intense back pain every day; his pain was aggravated by activity; his pain would limit his ability to stand and walk; he could not lift more than ten pounds. This pain persisted throughout the period leading up to the hearing in December of 2003.

[4] Plaintiff's Hepatitis C diagnosis was confirmed by needle biopsy on January 24, 2003. R. 251 - 252.

On March 28, 2003, Plaintiff reported to Dr. Templin of continuing tinnitus, with vertigo and lightheadedness, at which time Dr. Templin arranged for a second opinion with another gastroenterologist. R. 319 -320.

On April 9, 2003, Plaintiff was examined by Dr. Thomas Shaw-Stiffel at the UPMC Center for Liver Disease. Dr. Shaw-Stiffel noted that Plaintiff's liver biopsy revealed chronic Hepatitis with piecemeal necrosis, balloon degeneration, and bridging fibrosis. The doctor noted that Plaintiff was tolerating the Interferon treatments poorly and was suffering fatigue, dizziness, nausea, headache and generalized flu-like symptoms following each weekly Interferon injection for about two to three days in duration. Dr. Shaw-Stiffel prescribed Trazadone for Plaintiff's insomnia and mood alteration, and prescribed an increased dosage of Zoloft and Ultram for Plaintiff's musculoskeletal aches and pains. R. 294 -295.

On May 12, 2003, Plaintiff was seen at the UPMC Center for followup. Plaintiff had developed anemia[5], continued to suffer headaches, nausea with occasional vomiting, and fatigue. Dr. Shaw-Stiffel prescribed Aranesp or Procrit for the anemia and confirmed that the length of Interferon therapy was to be forty-eight weeks (with Plaintiff having completed his twelfth week). R. 285 - 286.

On June 16, 2003, Plaintiff was again seen at the UPMC Liver Center (in his sixteenth week of Interferon therapy). Plaintiff reported headache, shortness of breath with activity, nausea, vomiting, abdominal pain, and fatigue. Dr. Shaw-Stiffel reported that Plaintiff was beginning to show a virologic and biochemical response to the Interferon therapy, but that Plaintiff was suffering complications with anemia. R. 280 -281.

On August 25, 2003, Plaintiff was seen at the UPMC Liver Clinic (in his twenty-fifth week of Interferon therapy). Plaintiff reported headaches, blurred vision, shortness of breath, nausea, alternating diarrhea and constipation, decreased appetite, dizziness and fatigue. Plaintiff had lost thirteen pounds since June. Dr. Shaw-Stiffel noted that Plaintiff's Interferon treatment

---

[5] Anemia is defined as too few red blood cells which may result in insufficient oxygen to tissues and organs.

was now complicated by neutropenia[6] along with the anemia. R. 271-272.

By letter dated December 18, 2003, Dr. Shaw-Stiffel summarized Plaintiff's condition for counsel.  Dr. Shaw-Stiffel stated that Plaintiff had reached the fortieth week of his Interferon therapy with a desired biochemical and virologic response. The doctor indicated that with the completion of treatment he hoped Plaintiff would achieve a cure and that if Plaintiff cleared the virus, he had an excellent prognosis.  The doctor also indicated that Plaintiff continued to suffer from a number of side effects including insomnia, nausea, diarrhea, headache, severe fatigue and depression, most likely related to the Interferon therapy (although the Rivavarin therapy had caused the anemia and contributed to the severe fatigue).  The doctor stated that many of these symptoms would likely resolve after the Interferon therapy was complete.  Plaintiff was referred to a neurologist and pain management specialist for his continuing back pain. R. 324.

**D.     The Administrative Law Judge's Decision**

A disability hearing was conducted on December 19, 2003.  Plaintiff and a vocational expert testified at this hearing. R. 340-365.

On March 23, 2004, the ALJ issued his decision.  The ALJ made the following findings which are listed verbatim from his decision:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits only through March 31, 1996.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's back injury, status post surgery and hepatitis C with current Interferon treatment are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, regulation No. 4.

---

[6] Neutropenia is a marked decrease in the white blood cells.

> 5. The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.
>
> 6. The claimant has the residual functional capacity for light exertion with a sit/stand option.
>
> 7. The claimant is unable to perform any of his past relevant work.
>
> 8. The claimant was a "younger individual between the ages of 25 and 49" at the alleged date of onset, and is currently 50 and approaching advanced age.
>
> 9. The claimant has a "high school education."
>
> 10. The claimant has no transferable skills from semi-skilled work previously performed decision.
>
> 11. [omitted in original]
>
> 12. Although the claimant's exertional limitations do not allow him to perform the full range of work, based on the testimony of the Vocational Expert and using Medical-Vocational Rules 202.13 and 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.
>
> 13. The claimant has not been under a "disability" as defined in the Social Security Act, at any time through the date of this decision.

R. 16-17 (internal citations omitted).

### E.     **Standards of Review**

The Social Security Act provides limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as in this case, the Appeals Council has denied the applicant's request for review). In reviewing the Commissioner's decision, this court may not decide facts anew, reweigh the evidence, or substitute this court's judgment for that of the Commissioner or, by extension, the ALJ. See Herron v. Shalala, 913 F.3d 329, 333 (7th Cir. 1994). Rather, this court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. 42 U.S.C. § 405(g); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Pierce v. Underwood, 487 U.S. 552, 564-65 (1988) quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938). See also Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Plaintiff contends that the ALJ's decision is not

supported by substantial evidence.

A disability is defined under the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (Supp. 2002); 20 C.F.R. § 404.1505(a) (2002). A claimant is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A).

The Commissioner must perform a five-step sequential evaluation process to make disability determinations under the regulations. See 20 C.F.R. § 416.920. If the claimant fails to meet the requirements at any step in the process, the Commissioner may conclude that the claimant is not disabled under the Act. The ALJ must determine, in order: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity. See 20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

In this case, the ALJ evaluated the case under these guidelines and determined, at step five, that Plaintiff Echols could perform work in the national economy. R. 17. Specifically, the ALJ concluded that: (1) Echols was not currently employed in substantial gainful activity; (2) that he has an impairment or a combination of impairments considered "severe" pursuant to the requirements of 20 C.F.R. § 404.1520(c) and 416.920(b);  (3) that these impairments did not meet the criteria for listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) that Echols retained the residual functional capacity to perform a significant range of light work; and (5) that there were other jobs in the national economy that Echols could perform. R. 16-17.

Plaintiff has the burden of establishing that he is disabled under the Act. See 20 C.F.R. §§ 404.1512, 416.912.

**F.    Discussion**

Plaintiff argues that the ALJ failed to adequately consider and explain his rejection of competent medical evidence supporting the claim. Plaintiff argues that the ALJ did not engage in a complete analysis in regard to Plaintiff's lower back pain.[7]

As to Plaintiff's lower back pain, the ALJ refers to treatment records which he concludes: 1) indicate that Plaintiff was able to perform light work as early as February 1996 and 2) suggest that Plaintiff could perform a full range of light work within six months of his March 1997 surgery (as indicated in the Functional Capacity Assessment dated September 1997). R. 12 - 17. In reaching the conclusion that Plaintiff retains the residual functional capacity for light exertion with a sit/stand option, the ALJ indicates:

> ... I have given primary weight to the opinions of the claimant's treating surgeon and the claimant's current treating physician. Although the claimant incurred an injury just a few months prior to the date he was last insured for benefits on March 31, 1996, the early records show that the claimant's physician was of the opinion the claimant could pursue light work by February 1996, even if he could not return to his more exertionally demanding job as a construction carpenter. Indeed, even one month after he was last insured, the clamant was being advised to maintain an appropriate level of activity and continue with his exercise program. Once the clamant elected to undergo a surgical option, he was released to perform light work within six months of the surgery. A comprehensive functional capacity assessment, competed in September 1997, concluded that the clamant could perform a full range of light work. For several years following the clamant's last office visit in 1998, he did not consult a physician at all. Even when the claimant sought health care in 2002, his back condition was not mentioned as problematic.

R. 14.

In his motion for summary judgment, Plaintiff points out that there is medical evidence that Plaintiff could not return to work which the ALJ does not mention in his decision. These

---

[7] Plaintiff also argues that the ALJ has not adequately analyzed all the medical evidence in relation to Plaintiff's liver condition. However, because this Court is recommending the remand of this matter, we need not specifically address this argument.

9

include: 1) Dr. Smart's February 13, 1996 report that Plaintiff should remain off of work until his next appointment on February 27, 1996 (R. 193) and his subsequent referral to a pain clinic and direction to remain off work until discharge by the pain clinic (R. 189 - 190); 2) Dr. Macielak's treatment notices of September 30, 1997 interpreting the Functional Capacity Assessment as demonstrating Plaintiff's capacity to perform light duty with a maximum twenty pound lifting requirement on a **limited** basis (R. 162 - 163); and 3) Dr. Macielak's seven consistent recommendations that Plaintiff was unable to work from February 18, 1997 though September 22, 1997 (R. 164 - 170).

The opinion of claimant's treating physician that he cannot return to work is entitled to substantial weight. Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). An ALJ must explain reasons for rejecting uncontradicted medical evidence. Schaaf v. Matthews, 574 F.2d 157 (3d Cir. 1978). See also Kent v. Schweiker, 710 F.2d 110, n.5 (3d Cir. 1983) ("While the ALJ is, of course, not bound to accept physicians' conclusions, he may not reject them unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected."). Remand is appropriate in cases where the ALJ has failed to offer a clear explanation why medical evidence was rejected. Altman v. Commissioner of Social Security, 124 Fed.Appx. 748 (3d Cir. 2005). See also Kennedy v. Richardson, 454 F.2d 376 (3d Cir.1972) (it was error for an ALJ to reject uncontradicted medical evidence without a clear statement of the reasons for doing so).

Accordingly, Plaintiff's motion for summary judgment should be granted and this matter should be remanded.

### **III.    CONCLUSION**

For the foregoing reasons, it is recommended that the Motion for Summary Judgment filed by the Plaintiff [Document # 7] be granted. It is further recommended that the Motion for Summary Judgment filed by the Defendant [Document # 9] be denied. This matter should be remanded to the Social Security Administration for further proceedings.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local

Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights

                                                  S/ Susan Paradise Baxter
                                                  SUSAN PARADISE BAXTER
                                                  Chief United States Magistrate Judge

Dated: August 26, 2005